## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TALON WALL HOLDINGS, LLC,  )
ENTEKK GROUP LTD., and CHICAGO  )
HEIGHTS GLASS, INC.  )
  )
              Plaintiffs,  )
  )
        v.  )      21 C 6618
  )
REFLECTION WINDOW & WALL, LLC,  )
JOEL J. PHELPS, PEPPER  )
CONSTRUCTION CO., PROVIDENT  )
GROUP UIC SURGERY CENTER, LLC,  )
LENDLEASE (US) CONSTRUCTION  )
INC., 1400 LAND HOLDINGS, LLC, and  )
JOHN DOES 1–50.  )
  )
            Defendants.  )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants Reflection Window & Wall, LLC ("RWW"), Joel J. Phelps, Pepper Construction Co., Provident Group UIC Surgery Center, LLC, LendLease (US) Construction Inc., and 1400 Land Holdings, LLC's (collectively, "Defendants") motion for summary judgment and Plaintiffs Talon Wall Holdings, LLC, Entekk Group Ltd. ("Entekk Group"), and Chicago Heights Glass, Inc.'s (collectively, "Plaintiffs") motion for partial summary judgment. For the following reasons, Defendants' motion is granted-in-part and denied-in-part and Plaintiffs' motion is granted-in-part and denied-in-part.

## BACKGROUND

Plaintiffs allege that Defendants infringe four patents that claim a curtain wall system used for facades in high-rise buildings—U.S. Patent Numbers 9,752,319 ("'319 Patent") (Count I), 10,202,764 ("'764 Patent") (Count II), 10,233,638 ("'638 Patent"), and 10,094,111 ("'111 Patent") (together, "Asserted Patents").[1] Plaintiffs initiated this suit on December 10, 2021, Dkt. # 1, and filed the operative second amended complaint on March 17, 2022, Dkt. # 51. Plaintiffs allege that, through their use of RWW's U800 and UWALL systems and the related method ("RWW System"), Defendants directly infringed the Asserted Patents under 35 U.S.C. § 271. Dkt. # 51. Plaintiffs assert that RWW's "Tomahawk Anchors" correspond to the Asserted Patents' claims "shelf member." *See* Dkt. # 117-5.

While fact discovery was ongoing, Defendants sought leave to file an early summary judgment motion. Dkt. # 62. They argued that because all Asserted Claims required (and the accused products lacked) a "shelf member", early summary judgment in Defendants' favor would dispose of the entire case. The Court granted Defendants' motion, reasoning that we could construe the term "shelf member" in conjunction with the summary judgment ruling and that the parties could obtain all the discovery necessary to rule on the "shelf member" issue. *See* Dkt. # 95. Furthermore, early summary judgment would save the parties "immense time, effort, and money" and

---

[1] Plaintiffs asserts claims 1, 9, 11–13, and 19–20 of the '319 Patent, claim 1 of the '111 Patent, claims 4, 16–18, 20–22, 33, and 35 of the '764 Patent, and claims 1, 2, and 7 of the '638 Patent ("Asserted Claims").

would "conserv[e] the resources of this Court." *Id*. at 4.

Defendants filed their motion for summary judgment on December 2, 2022, arguing that the accused products do not contain a shelf member and therefore do not infringe any of the Asserted Patents. Dkt. # 113. Plaintiffs filed their motion for partial summary judgment on July 27, 2023, seeking judgment in their favor that the accused products do contain a shelf member. Dkt. # 181.

### *The Asserted Patents*

The asserted independent claims[2] of the Asserted Patents read as follows:

<u>'319 Patent</u>

Claim 1. A building facade system comprising:

a shelf member on a building floor slab;

vertical mullions hanging from said shelf member to a building level below said floor slab;

a curtain panel supported on said vertical mullions;

threaded posts fastened to said shelf member by clamping said shelf member between an upper threaded engagement member and a lower threaded engagement member;

and, said posts extending from said shelf member to said building floor slab and transferring the weight carried by said shelf member to said building floor slab, wherein a portion of said posts are in compression, whereby said shelf member, said vertical mullions and said curtain panel are supported on the floor slab.

<u>'111 Patent</u>

Claim 1. A building facade system comprising:

---

[2] For efficiency, the Court recites only the independent claims here.

a shelf member extending horizontally along and directly supported on a first building floor slab, the shelf member having left and right terminal ends;

a pair of vertical mullions, wherein each mullion comprises a top terminal end and a bottom terminal end;

wherein the top terminal end of one of said vertical mullions is fastened to said left terminal end of said shelf member and the top terminal end of the other one of said vertical mullions is fastened to said right terminal end of said shelf member;

wherein each said vertical mullion thereby hangs from said shelf member with its bottom terminal end adjacent a second building floor slab below said first floor slab, and wherein each said vertical mullion is not directly connected to said first floor slab;

a curtain panel supported by said vertical mullions;

and, wherein said shelf member, said vertical mullions and said curtain panel are supported by said first floor slab.

'764 Patent

Claim 1.[3] A method of installing a curtain wall on a building comprising the steps of:

securing a curtain panel to a shelf member;

providing a plurality of posts, wherein each post is adjustably fastenable to said shelf member along said post;

after said step of securing said curtain panel to said shelf member, resting said posts on a building floor slab with said shelf member above said floor slab and said curtain panel hanging below said floor slab;

after said step of resting said posts on the building floor slab, adjusting said posts relative to said shelf member thereby placing said shelf member at a desired position above said floor slab and placing said curtain panel at a desired position relative to said floor slab;

---

[3] Claim 1 of the '764 Patent is not asserted, but Asserted Claim 4 depends from Claim 1.

after said step of adjusting said posts relative to said shelf member, fastening said posts to said shelf member;

and, after said step of fastening said posts to said shelf member, transferring the weight of said curtain panel and said shelf member through said posts to said floor slab;

Claim 16. A method of installing a curtain wall on a building comprising the steps of:

securing a curtain panel to a shelf member;

fastening a plurality of posts to said shelf member;

after said steps of securing said curtain panel to said shelf member and fastening said posts to said shelf member, resting said posts on a building floor slab with the shelf member above said floor slab and said curtain panel hanging below the floor slab;

and, after said step of resting said posts on said floor slab, transferring the weight of said curtain panel and said shelf member through said posts to the floor slab.

Claim 33. A method of installing a building facade system wherein the facade system comprises:

a shelf member;

vertical mullions secured to said shelf member;

a post extending a distance between said shelf member and a building floor slab;

wherein said post distance between said shelf member and the building floor slab is adjustable;

wherein said post is fastenable to said shelf member;

said method comprising the steps of:

securing said vertical mullions to said shelf member;

after securing said vertical mullions to said shelf member, adjusting said post distance thereby adjusting said distance between said shelf member and the building floor slab;

and, after adjusting said post distance, fastening said post to said shelf member hereby fixing said post distance between said shelf member and the building floor slab.

<u>'319 Patent</u>

Claim 1. A building facade system comprising:

a shelf member;

vertical mullions secured to said shelf member;

a post extending a distance between said shelf member and a building floor slab;

wherein said post distance between said shelf member and said building floor slab is adjustable;

wherein said post is fastenable to said shelf member;

wherein, prior to fastening said post to said shelf member, said post is rotatable and supports said shelf member above said building floor slab while said post distance is adjusted thereby adjusting said distance between said shelf member and said building floor slab;

and, wherein, after fastening said post to said shelf member, said post distance between said shelf member and said building floor slab is fixed.

Dkt. # 171, ¶¶ 14–17.

The Asserted Patents share the same specification and relate to a building facade system that forms a particular type of curtain wall around a building, which protects it from the elements. The Asserted Patents' "Summary of Invention" states that the "invention of the continuous horizontally supported and post anchored system as

6

described herein eliminates the need for all of the above costly and labor-intensive components of prior building façade designs and substantially reduces the cost of building enclosure." *See* Dkt. # 117-1, at 2:21–25. It continues:

> In one form thereof the present invention is directed to a building facade system including a shelf member supported on a building floor slab. Vertical mullions hang from the shelf member to a building level below the floor slab. A curtain panel is supported on the vertical mullions. Posts are fastened to the shelf member. The posts extend from the shelf member, are secured the building floor slab and support the shelf member, whereby the shelf member, the vertical mullions and the curtain panel are supported on the floor slab.

*Id*. at 2:38–47.

As seen in Figure 2 of the Asserted Patents, the facade framework (16) includes multiple vertical mullions (20, shown in red) that are fastened to a horizontal shelf member (18, shown in blue) and that extend between the floor slabs (notated as "AFS" for "above floor slab" and "BFS" for "below floor slab").



FIG. 2

Dkt. # 171, ¶ 24.

All of the Asserted Claims require a shelf member. None of the Asserted Claims recite a single mullion attached to a shelf member (i.e., any claim reciting mullions always recites them as plural). The Asserted Patents explain that "[t]he top terminal ends of vertical mullions are fastened to the shelf members, thereby hanging the mullions therefrom." *See* Dkt. # 117-1 (Abstract). The preferred embodiment described in the specification and shown in the drawings includes such a structure.

Figure 8 of the Asserted Patents is an exploded view of a horizontal shelf member (18) and vertical mullion (20), showing how the shelf member and mullion are secured by fastener screws (26) through holes (18H).



**FIG. 8**

Dkt. # 171, ¶ 28.

The Asserted Patents explain that the "top terminal end of the mullions 20 are fastened to the shelf members 18 by abutting the mullion top edge 20T to the bottom face of the shelf member base plate 18, inserting the fastener screws 26 through the holes 18H, and threadingly securing the screws 26 into the mullion spines 20S." Dkt. # 117-1, at 7:46–51. As the curtain panels are "hung" on the shelf members on the above floor slab ("ABS") with the vertical mullions, "the vertical mullions 20 are, therefore, in tension." *Id*. at 6:56–59.

The Asserted Patents describe the invention's shelf members as "preferably elongate extruded aluminum members." *Id*. at 6:11–17. There is no disclosure in the specifications of the Asserted Patents of a single shelf member made up of multiple,

spaced-apart anchors (or of anything other than a single, unitary piece of material).[4]

The Asserted Patents explicitly distinguish the claimed shelf member system from prior systems that are "not readily adjustable to compensate for construction tolerances of the building, floor slabs, are generally cumbersome and difficult to install and relatively costly. Prior building framework is supported to the slab structure via vertical load carrying members secured to the slabs via large unsightly and obtrusive anchors from the ends of the verticals to the top and bottom of slabs." *Id*. at 1:40–47. The Asserted Patents criticize "[p]rior curtainwall systems with load carrying members [because they] require separate installations of firesafing insulation, reinforcing, and smoke sealant to prevent the transmission of fumes and smoke between floors. These items are very costly." *Id*. at 1:61–65. They continue: "The above prior building framework methodologies considerably increase the material and labor costs associated with the enclosure of a building. Accordingly, a need exists for an improved building façade system." *Id*. at 2:14–17. The Asserted Patents also state that "[t]he invention of the continuous horizontally supported and post anchored system as described herein eliminates the need for all of the above costly and labor-intensive components of prior building façade designs and substantially reduces the cost of building enclosure." *Id*. at 2:21–25.

---

[4] Plaintiffs fail to adequately dispute this fact since they state only that the *shelf members* of the building facade system are spaced apart. *See* Dkt. # 171 at 37–38.

*Evidence*

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.[5]

Plaintiffs claim that their "Talon Wall System" is a commercial embodiment of the Asserted Patents. As shown below, the Talon Wall System uses a framework including a horizontal shelf member secured to the top of vertical mullions with screws:



Dkt. # 171, ¶ 32. At least one embodiment of the Talon Wall System utilizes a shelf

---

[5] Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

member that runs horizontally across the upper span of each wall segment. The Talon Wall's shelf member forms the upper casing for the curtain wall panel, and covers (thus preventing access to) the void between the vertical mullions.[6] The Talon Wall System utilizes fastener screws that pass through holes in the shelf member and are secured to the tops of the mullions. Plaintiff Entekk Group's website notes that the Talon Wall System "[r]equires no acoustical, firesafing insulation or sealant at floor slab interfaces." Dkt. # 117-11; Dkt. # 117-12.

Defendant RWW is an industry leader in the design, fabrication, and installation of structural glass facades used in construction of (mostly) high-rise buildings, both residential and commercial. RWW offers the ability to customize construction solutions for every project. RWW contracted with other Defendants to construct building at the UIH Medical Center and 1400 South Wabash Tower.

Defendants assert the RWW System utilizes multiple, spaced-apart anchors to secure a curtain panel. Plaintiffs dispute this in part, stating that there are nineteen versions of the Tomahawk Anchors and eight of them are as wide as the curtain panel to which they are attached, in which case just one anchor (not multiple) is used to secure the curtain panel. Those eight versions are the TA-08, TA-09, TA-12, TA-13, TA-16, TA-17, TA-18, and TA-19 ("Narrow Curtain Panel Tomahawk Anchors"). The Court will refer to the other eleven versions as the "Standard Tomahawk Anchors." Plaintiffs

---

[6] Plaintiffs' attempt to dispute this fact fails because they cite the Asserted Patents, not the Talon Wall System.

include images of TA-12 Tomahawk Anchor as one example:



Dkt. # 171, ¶ 41.

Defendants put forth the annotated images below as showing "a close up of the accused RWW Tomahawk Anchor and a representative example of the accused RWW System from a recent installation":



Dkt. # 171, ¶ 42.  Plaintiffs dispute this in part, stating while the images show "an"

accused RWW Tomahawk Anchor, some versions of the Tomahawk Anchors (i.e., the

Narrow Curtain Panel Tomahawk Anchors) "are just as wide as the curtain panel they

are attached to."  *Id*.

The RWW System has never used a shelf member from which multiple mullions

are hung.[7]  Each anchor in the RWW System is connected to the rear of a mullion below

the anchor's top surface by horizontal shear bolts (the horizontal bolts pass through the

---

[7] Plaintiffs attempt to dispute this fact by pointing to the Narrow Curtain Panel Tomahawk Anchors.  *See* Dkt. # 171, ¶ 43 (citing Dkt. # 170-4).  They state that the Narrow Curtain Panel Tomahawk Anchors (1) "are about as wide as the curtain panels to which they are connected" and (2) "connect to multiple mullions."  *Id*.  But that second statement, the narrow anchors connect to multiple mullions, is not apparent from the cited document and Plaintiffs do not cite a specific point where that information may be found.  *See* L.R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact.  Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").  Thus, Defendants' asserted fact is admitted.

two horizontal openings shown in the anchor above). The use of horizontal bolts to connect the anchor to the rear of the mullion creates a shear force (as opposed to a tensile force). As seen in the image above, the anchors do not form the upper casing of the curtain wall panel.

For versions of the RWW Tomahawk Anchors using more than one anchor, an anchor can be temporarily removed during installation of the RWW System to allow for adjustment because the curtain panel is still supported by the second anchor. These versions use spaced-apart anchors to create a gap between them wherein fire-safing materials can be inserted.

The void created by draping a curtain wall along the outside of the building can, depending on the design of the curtain wall, create an opportunity for fire, smoke, and hot gases to pass rapidly within the building to floors directly above, potentially igniting any flammable substances in their path. To reduce the risk of loss of life and property, the gaps inherent in vertical curtain wall systems should be filled after panel installation with fire retardant packing materials which must be properly compressed and verifiably free from voids. Insufficient compression may create gaps through which oxygen can pass to feed a fire, while excessive compression can reduce the retardant properties of the packing material. Defendants state that the ability to pack the fire-safing materials after a curtain panel is installed on the building is critical to maintaining the proper material compression. Plaintiffs dispute this fact, asserting it is not critical for the Talon Wall System.

15

Versions of the RWW Tomahawk Anchors using more than one anchor provide complete access to the void during the installation process, allowing fire safety professions to fill the entire void with material that is precisely compressed during the installation process. These anchors facilitate visual and physical verification that the fire-safing material is properly installed. RWW's Chief Operating Officer, Defendant Joel Phelps, believes that using a single shelf member would obscure the fire gap after panel installation and prevent effective installation of fire-safing material, as well as verification that fire-safing material is properly installed.

The majority of the RWW anchors are each secured to a single bolt that rests on a steel tube in the building floor slab, and not on the floor slab itself. The corner anchors in the RWW System typically include two bolts (show below at the 1400 South Wabash building), but only one is a dead-load bolt that rests on the steel tube in the floor slab; the other bolt is a wind-shear bolt that does not extend below the anchor such that it is spaced apart from the steel tube and the floor slab.



Dkt. # 117-13. Plaintiffs dispute this fact in part, stating that the specifications for

curtain panels do not uniformly disclose separate "wind shear bolts" and "dead load bolts" for corner or narrow anchors.

The second bolt is included only because the corners of the building facade system require additional wind resistance; it clamps the upper portion of the anchor to the lower, L-shaped angle, with the downwardly projecting portion of the angle residing in a channel to resist wind load. Of the 1,196 anchors fabricated for installation on the UIH building, only 14 include a second bolt that may incidentally contact the steel tube in the floor slab, simply due to the length of the bolts used; in all instances, the second bolt is included only for wind-shear purposes. The wind-shear bolt simply secures the upper portion of the anchor to the lower angle portion; the angle portion, which extends into and floats within a channel in the floor slab, actually resists the wind load.

In the patented system, the curtain panel hangs from the shelf member. Thus, as the position of the shelf member is adjusted relative to the floor slab, the position of the curtain panel is simultaneously adjusted. The shelf member has a slot through which a threaded bolt passes. A nut or "lower threaded engagement member" moves up and down as the threaded bolt is rotated to adjust the vertical distance between the shelf/curtain panel and the floor slab. The horizontal distance of the shelf/curtain panel relative to the floor slab is adjusted by moving them so the slot in the shelf member is at a desired location relative to the threaded bolt. Once the desired position of the shelf member/curtain panel relative to the floor slab is achieved, they are locked in place by tightening a nut or "upper threaded engagement member" on the threaded shaft against

17

the top of the shelf member.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*,

259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704– 05 (7th Cir. 2011).

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014); LR 56.1(a)(2). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; LR 56.1(b)(2)–(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* LR 56.1(d)(1)–(2).

If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." LR 56.1(e)(3). Failure to properly controvert a fact supported by admissible evidence results in its admission. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); LR 56.1(e)(3). Facts that a party raises in a

Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. The Court also disregards legal arguments in the statement of facts and does not consider statements unsupported by admissible evidence. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). The Local Rules are not mere technicalities, and district courts are entitled to expect strict compliance with Local Rule 56.1. *See Slabon v. Sanchez*, 2023 WL 3451274, at *2 (7th Cir. 2023).

## **DISCUSSION**

### I.    **Person of Ordinary Skill in the Art**

We first define a person of ordinary skill in the art ("POSA") of the Asserted Patents. Defendants would define a POSA as a person having "a degree in structural engineering or a similar civil engineering field and at least two years of experience in the building construction industry; alternatively, one could be considered a [POSA] without the relevant degree with at least five years of experience in the building construction industry." Dkt. # 171, ¶ 13. Plaintiffs define a POSA as a person with three years' experience installing curtain walls for high-rise buildings. Neither party sufficiently support their proposed positions, but we find that Defendants' less exacting definition is sufficient.

## II.     Claim Construction

Before assessing infringement, we must first construe the disputed term "shelf member", found in each of the Asserted Patents.  *See Duncan Parking Techs., Inc. v. IPS Grp. Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).  The construction of a patent claim, "including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996).  In general, claim terms are given the meaning they would have to a person having ordinary skill in the art at the time of the patent's effective filing date.  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).  To determine what a person having ordinary skill in the art would understand a term to mean, the Court first considers the intrinsic evidence, which includes claim language, the patent's specification, and the patent's prosecution history.  *See Unique Concepts v. Brown,* 939 F.2d 1558, 1561 (Fed. Cir. 1991).  The intrinsic evidence forms the public record of what the patentee claimed, and the public is entitled to rely on this record to determine a patent's scope.  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996).

When considering the intrinsic evidence, the Court first looks at the language of the claim or claims in which the term appears.  *Phillips,* 415 F.3d at 1314. Claim language supplies information about the meaning of a term through the context and relationship to other claims.  *Id.*  And because terms are usually used consistently, a term in one claim of the patent can provide insight into its meaning when used elsewhere.  *Id.*

Next, the Court looks at the specification, which clarifies the claim language. *Id.* at 1315. "The terms must be read in view of the specification, of which they are a part" because "they are part of a fully integrated written instrument." *Id.* (cleaned up). The specification, therefore, is both highly relevant to and often dispositive of a term's meaning. *Id.* However, the specification is not without pitfalls—limitations found within it cannot be read into claims that do not contain the same limitations. *See Golight, Inc. v. Wal-Mart Stores,* 355 F.3d 1327, 1331 (Fed. Cir. 2004).

Finally, the Court looks at the patent's prosecution history. A patentee can act as a lexicographer, but he or she must do so in the written description or prosecution history with "reasonable clarity, deliberateness, and precision." *Id.* at 1332. The prosecution history can clarify a term's definition and must be consulted to determine whether the patentee gave a special meaning to a term or disclaimed aspects of the invention. *See generally id.* at 1331–33.

If there remain ambiguities after considering the intrinsic evidence, the Court may look to extrinsic evidence. *See Phillips,* 415 F.3d at 1317. Extrinsic evidence includes dictionaries, learned treatises, and expert and inventor testimony. *Id.* The Court may also consider extrinsic evidence, especially technical dictionaries, if the Court finds it useful to understand technical terms of art. *Id.* However, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (cleaned up). Additionally, extrinsic

evidence cannot contradict claim language that is unambiguous from the intrinsic evidence. *Id*. at 1324.

With these principles in mind, we examine the disputed term, "shelf member." Defendants propose that "shelf member" should be construed to mean "a flat, continuous structure running along the upper span of a curtain panel for supporting objects (namely, mullions)." Dkt. # 114, at 11. They assert such a construction is consistent with the plain meaning of "shelf," which brings to mind examples of flat, continuous shelves for supporting objects. It is also consistent with the specification, Defendants continue, which characterizes shelf members as "preferably elongate extruded aluminum members" and summarizes the invention as a "continuous horizontally supported and post anchored system." *Id*. at 12. They also point out that the Asserted Patents "do not teach anything other than a single flat, continuous shelf member (connected to two mullions, one at each end of the shelf member); indeed every figure shows a single, unitary shelf member running along the upper span of a curtain panel." *Id*. at 4. Furthermore, Defendants argue the specification refers to the invention as requiring "vertical mullions" (plural) hanging from "the shelf member" (singular).

Plaintiffs' proposed construction of "shelf member" focuses on its function. Plaintiffs propose that for the '764, '319, and '638 Patents, "shelf member" means "[a]n anchor positionable above a floor slab to adjustably support a curtain panel connectable to the anchor so that adjusting and fixing the anchor's position with respect to the floor slab fixes the curtain panel's position with respect to the floor slab." Dkt # 181, at 9.

23

For the '111 Patent, Plaintiffs propose "shelf member" means "[a]n anchor positionable above a floor slab and having right and left terminal ends, each capable of being fastened to a mullion." *Id*. at 10.

We first note the settled Federal Circuit law stating that "[w]here multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1378 (Fed. Cir. 2019) (quoting *SightSound Techs., LLC v. Apple Inc*., 809 F.3d 1307, 1316 (Fed. Cir. 2015)). Plaintiffs have raised no viable argument as to why "shelf member" should have a different meaning for the '111 Patent than for the others. They assert that a claim term "may" have different meanings for different patents in the same family where the "two definitions can exist in harmony within the patent family." Dkt # 181, at 10 (quoting *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1383 (Fed. Cir. 2022)). But Plaintiffs do not put forth any such argument, instead stating that claim 1 of the '111 Patent "includes words that do not appear in the claims of" the other Asserted Patents. *Id*. at 9. We therefore construe "shelf member" consistently across the Asserted Patents.

We also agree with Defendants that "shelf member" need not be defined by its function, and rather should be defined in structural terms. *See* Dkt. # 186, at 8–9 (citing *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324 (Fed. Cir. 2002)). Plaintiffs argue that courts "routinely include 'functional' language to construe

claim terms" but do not adequately explain why the Court should do so here. Dkt. # 189, at 7–9.

Based on the intrinsic evidence, including the claim language and specification, we construe "shelf member" as a single continuous structure running along the top span of a single curtain panel, which supports the curtain panel. The crux of the parties' disagreement seems to be whether multiple structures constituting a "shelf member" can support one curtain panel.[8] Ultimately, the Asserted Patents make clear that one shelf member supports one curtain panel, and that one shelf member consists of one single structure. It is undisputed that there is no disclosure in the specification of a single shelf member made up of multiple, spaced-apart anchors (or of anything other than a single, unitary piece of material).

## III.    Infringement

Having construed "shelf member," we now move on to the question of infringement. A party infringes a patent when it "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor[.]" 35 U.S.C. § 271(a). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) (citation omitted). Under the doctrine of equivalents, the accused product infringes the patent if "there is

---

[8] The question of whether multiple "mullions" are required by the claims is outside the scope of this early summary judgment motion.

equivalence between the elements of the accused product . . . and the claimed elements of the patented invention." *Id.* (citation omitted). The patentee has the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

### a. Literal Infringement

Plaintiffs assert that the anchors of the Accused Products constitute shelf members. As construed, it is clear that the majority of the Accused Products (i.e., the Standard Tomahawk Anchors) do not contain a shelf member. It is undisputed that for the Standard Tomahawk Anchors, Defendants' system uses multiple, spaced-apart anchors (and not one continuous structure) to secure a curtain panel. This fails to meet the requirement of a shelf member to be one single continuous structure running along the top span of a single curtain panel. As Plaintiffs only argued for literal infringement for these anchors under their rejected proposed construction, they have waived this argument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Because every Asserted Claim requires a shelf member, Defendants' motion for summary judgment of no literal infringement is granted as to the Standard Tomahawk Anchors. Plaintiffs' motion for partial summary judgment is denied as to the Standard Tomahawk Anchors.

Plaintiffs contend, however, that not all of the Accused Products use multiple, spaced-apart anchors. Rather, in some versions (namely the Narrow Curtain Panel Tomahawk Anchors), Defendants' anchors are as wide as the curtain panel to which

26

they are attached, in which case just one anchor is used to secure one curtain panel. Defendants do not dispute the existence of these versions, stating only they are "atypical" and "*de minimus*." Dkt. # 186, at 12. Defendants also do not dispute that the Narrow Curtain Panel Tomahawk Anchors run along the top span of the curtain panel, arguing only that they are "attached to the rear of a mullion . . . not to the top of a mullion." *Id*. But that is a question beyond the scope of the parties' motions, which deal only with the existence of a shelf member. Because Defendants put forward no evidence from which the Court can conclude that the Narrow Curtain Panel Tomahawk Anchors do not contain a shelf member, Defendants' motion for summary judgment is denied as to the Narrow Curtain Panel Tomahawk Anchors. Plaintiffs' motion for partial summary judgment is granted as to the existence of a shelf member in the Narrow Curtain Panel Tomahawk Anchors.

### b. Infringement Under the Doctrine of Equivalents

Plaintiffs argue that even construing shelf member to exclude systems comprising multiple spaced-apart anchors, such systems (and thus the Accused Products) would nonetheless contain the "equivalent" of a shelf member under the doctrine of equivalents. Because we found in Plaintiffs' favor as to literal infringement of the Narrow Curtain Panel Tomahawk Anchors, we address herein the Standard Tomahawk Anchors only.

We find that Plaintiffs are foreclosed from capturing the multiple, spaced-apart anchors of the Standard Tomahawk Anchors using the doctrine of equivalents in light

27

of the "specific exclusion" principle. Federal Circuit case law establishes that a patentee is barred from asserting infringement under the doctrine of equivalents where it "defin[ed] the claim in a way that clearly excluded certain subject matter, [thereby] implicitly disclaim[ing] the subject matter that was excluded[.]" *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc*., 242 F.3d 1337, 1345 (Fed. Cir. 2001); *see also id*. at 1345 ("A particular structure can be deemed outside the reach of the doctrine of equivalents because that structure is clearly excluded from the claims whether the exclusion is express or implied."). The doctrine of equivalents cannot broaden a claim to cover a feature that is "the opposite of, or inconsistent with, the recited limitation." *Augme Techs., Inc. v. Yahoo! Inc*., 755 F.3d 1326, 1335 (Fed. Cir. 2014). Claim construction can inform whether a patent clearly excludes the asserted equivalent structure, either implicitly or explicitly. *See*, *e.g*., *Athletic Alts., Inc. v. Prince Mfg., Inc*., 73 F.3d 1573 (Fed. Cir. 1996) (tennis racket stringing patent was construed to require at least three offset distances and could not have equivalent in racket with two offset distances).

Here, we find that the claim language (and the Court's construction) excludes the possibility of capturing the multiple, spaced-apart anchors of the Standard Tomahawk Anchors using the doctrine of equivalents. The language of the Asserted Claims makes clear that one continuous, single-structure shelf member supports one curtain panel by referring to both the shelf member and curtain panel in the singular form. For that and other reasons, including the teachings of the specification, we have construed shelf

member to mean "a single continuous structure running along the top span of a single curtain panel, which supports the curtain panel." "Multiple" and "single" are mutually exclusive, and multiple anchors is "the opposite of, or inconsistent with," the term shelf member, as construed, which requires one structure. *See Augme*, 755 F.3d at 1335.

Plaintiffs "had an opportunity to draft the patent[s] in a way that would make clear that [shelf members constituting multiple structures as well as a single structure] were within the scope of the invention, but the patentee did just the opposite, leaving competitors and the public to draw the reasonable conclusion that the patentee was not seeking patent protection" for curtain wall panel systems using multiple anchors or structures to secure a single curtain panel. *See SciMed*, 242 F.3d at 1347. We therefore conclude that a reasonable jury could not find the Accused Products contain a shelf member under the doctrine of equivalents. *See id*. Defendants' motion for summary judgment as to the doctrine of equivalents is granted, and Plaintiffs' motion for partial summary judgment as to the doctrine of equivalents is denied.

## **CONCLUSION**

Defendants' motion for summary judgment [113] is granted-in-part and denied-in-part and Plaintiffs' motion for partial summary judgment [169] is granted-in-part and denied-in-part as set forth above.  Status hearing set for 5/9/2024 at 10:15 a.m. to discuss the next steps of this case, including a proposed discovery schedule and the possibility of settlement.

It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: April 9, 2024